KING, Senior Judge,
dissenting:
Because I am persuaded that the able and experienced trial judge carefully and thoughtfully weighed the testimony of the complaining witness, Mr. Gorke, with respect to the identity of his assailant and that the trial judge’s assessment of the accuracy and credibility of that identification is so sound that it cannot reasonably be rejected by this court, I respectfully dissent from the majority’s determination that the identification fails.
I am in essential agreement with the facts as set forth in the majority opinion. Both Mr. Gorke in his testimony and appellant, A.W., in his video statement to police after he was taken into custody related that a group of young, black males entered a Metro car at the Gallery Place Metro Station in the early evening of December 27, 2010. Mr. Gorke, who was sitting next to the wall of the car in the left-most space of a two-person bench seat facing to the rear, testified that there were four males, two dressed as males and two dressed as females. One of the latter, who the witness thought actually could have been a female (hereinafter the “female”), sat next to him to his right and the other sat across the aisle from the female, in the left-most space of another two-person bench seat which extended to the far wall of the car. All three faced to the rear. The second person dressed as a female was described by the witness as a male wearing thigh high boots, a dark coat, jeans, and a long curly wig (hereinafter the “cross-dresser”).
One of the male members of the group (hereinafter the “assailant”) sat directly in front of Mr. Gorke in the next bench seat *1102 to the rear of the train facing forward. The doors to the car — one set on each side — were between the bench seats which were occupied by Mr. Gorke and the assailant. Thus, the two faced each other divided by a space slightly greater than the width of the two doors which is approximately eight to ten feet. Because the group was noisy, Mr. Gorke’s attention was drawn to members of the group, particularly the one who was to become the assailant. The fourth member of the group was standing off to the side and played no apparent role in the events that followed.
Two stops later — approximately three to five minutes elapsed time — the train arrived at Union Station and the members of the group approached the exit doors to Mr. Gorke’s right when the assailant grabbed at the phone that Mr. Gorke was holding in his hand. The two then struggled over the phone and, as they edged toward the open doors, Mr. Gorke was struck on the left side of his head causing him to fall out of the car and onto the platform; however, he managed to hold on to his phone. The group of four, as well as other passengers who had exited the train, all dispersed. Nine days later, under circumstances described below, Mr. Gorke viewed an array of nine photos and identified A.W. as the assailant.
A.W., who was taken into custody a week after the photo identification described above, gave a videotaped statement to police. A.W. related a story similar to the one provided by Mr. Gorke with some minor differences and one significant disagreement that goes to the heart of the identification issue on which this case turns. A.W. stated that he and his nephew, both dressed as females, boarded the train at Gallery Place at the same time as a group of three “boys” who all had “short haircuts” and were dressed in male attire. Although the other three boarded when he and his nephew did, the two groups were not together. A.W. stated that he has seen the other three hanging around, but he did not know their names, although he knew one of them as “J.R.” After boarding, his nephew sat in a seat next to a man who had a phone in his hand — Mr. Gorke.
One of the “boys” (assailant) sat in the seat across from, and facing Mr. Gorke, i.e., in the same place where Mr. Gorke testified that the assailant sat. As they were pulling into Union Station, A.W. and his nephew got up to leave and the assailant grabbed Mr. Gorke’s phone — A.W. said he and his nephew were the first riders out the doors of the car and Mr. Gorke bumped them from behind as he came onto the platform. A.W. thought that Mr. Gorke had been struck in the head by the chubby member of the group of three “boys” that boarded when he had at Gallery Place. As can be seen, the major difference between A.W.’s version and Mr. Gorke’s version of the incident was that while Mr. Gorke identified A.W. as his assailant, A.W. insists that the assailant was one of the three “boys” who boarded the train when he did and that he was the cross-dresser seated across the aisle from the female who was his nephew.
As noted in the majority’s fact statement Mr. Gorke was interviewed by Officer Ferguson and thereafter a lookout went out for two transgender males one of whom was described as wearing a long curly wig, thigh high boots, jeans and a dark jacket. Several hours later Ferguson was at Gallery Place Station where he encountered a group of four people, two of whom met the descriptions of the transgender males who were at the scene. One of them, who turned out to be A.W., without prompting, blurted out: “we didn’t do anything to that white man. He fell on his own. We didn’t do anything to that man at Union Station.”
*1103 A photograph was then taken of A.W. which was admitted in the trial court as “GovEx8.” It shows a person who is apparently a male wearing jeans, black boots that reach to the knees, a dark jacket reaching to the top of the thighs and curly hair that falls several inches below the top of the shoulders. Officer Ferguson described the hair-do worn by A.W. at the time he was stopped and in the photograph as a wig (“it wasn’t natural hair”). After the photo was taken, A.W. was released; however, he was taken into custody a week later after he was identified by Mr. Gorke from a photo array.
After being interviewed by Officer Ferguson, Mr. Gorke was transported to the hospital where, in an interview conducted by Detective Dorrity, he described the assailant as being between seventeen and twenty-two years old, approximately 5'9" in height, with close cropped hair and a tan coat. Subsequently, Detective Dorrity prepared a photo array, which included nine black and white photos of young black males with short hair — all of which were mounted on a single sheet that was admitted as GovEx7. When the array was shown to Mr. Gorke on January 6, 2011, he identified the photo of A.W. as the assailant. The photo of A.W. was approximately two years old and his hair was very short — not more than one inch long. Detective Dorrity also possessed a photo of A.W. that was approximately six months old, which was not used in the array because AW.’s hair had been bleached. That photo, which was admitted during the motions hearing, shows A.W. with hair approximately two inches-long. However, except for the bleached hair, A.W., as depicted in the six month-old photo, closely resembles the photo used in the array.
As previously mentioned, seventeen days after the incident, A.W. was taken into custody and interviewed by Dorrity and another officer which was videotaped and is part of the record on appeal. During the course of the interview, A.W. provided the version of the events on the train and the platform at Union Station set forth above. In the video, A.W. appears to have straight black hair that hangs to the top of his collar at the sides in the back. It does not resemble the hair-do worn by A.W. in GovEx8 which shows hair that is much longer (at least five to six inches longer), curlier and much shinier in color than the hair worn by A.W. in the video. When A.W. was asked during the interview whether he was wearing a wig the night of the incident he replied: “No, it was tracks. I don’t wear no wig.” He explained that tracks referred to strands of hair that are “weaved in” to existing hair. He also stated: “I can’t possibly be putting on a wig since I get tracks put in every time and when he stop me I have tracks in my hair,” and “I had black hair, and it was like pinned back. It was long curls and I had it pinned up in the middle and it was sitting high.” Finally, he said while touching his hair that “at Union Station that night I had long hair like this.”
The proceedings in the trial court consisted mainly of matters related to the various motions to suppress. Like the majority I do not address the rulings by the trial judge on those motions. It was stipulated that the evidence received during the motions proceedings would apply at trial and after the rulings on the motions, additional evidence was received. The record includes the testimony of Mr. Gorke (motion and trial), Officer Ferguson (motion), and Detective Dorrity (motion and trial), the videotape of the interview of A.W., the videotape showing the Metro car arriving at Union Station where the assault occurred, and various exhibits which were discussed above.
The record also includes the testimony of Dr. Lori Van Wallendael, an Associate *1104 Professor of Psychology, at the University of North Carolina at Charlotte, whose primary area of specialization for the ten years preceding her testimony had been “memory, specifically as it’s applied to forensic situations. So, eyewitness reliability, lineup construction, earwitness or voice recognition and accuracy....” She testified during the motions portion of the proceeding where she was qualified as an “expert on cognitive psychology, human memory with an emphasis on witness reliability.”
With one exception, which is discussed below, I am in essential agreement with the majority’s summation of the evidence presented in the trial court. In summarizing that evidence the majority concludes: “All in all, although the District’s affirmative case has its inconsistencies, Mr. Gorke’s selection of A.W.’s photograph from the photo array arguably constituted formidable evidence.” While I agree that the identification evidence was formidable, I would not qualify that assessment by describing it to be arguably so, particularly when we examine the reasons given by the trial judge for concluding that Mr. Gorke’s identification of A.W. as the assailant was sufficiently credible for the judge to conclude that the government had proved its case beyond a reasonable doubt.
The trial judge spent a considerable amount of time explaining his reasons for crediting Mr. Gorke’s testimony that A.W. was the assailant. In doing so the judge relied in large part upon the testimony of the expert which he found to be “extraordinarily helpful in assessing all of this information. ... I credit her testimony.” Specifically he addressed points made by the expert regarding whether the witness was actively involved in the incident rather than being a bystander, whether the time during which the witness observed the assailant was stressful for the observer, the length of that period of observation, whether the witness’s attention was distracted during the observation, and the amount of time that elapsed between the incident and the initial identification procedure. The judge found that Mr. Gorke’s circumstances were positive in favor of an accurate identification for all but one of these factors.
For example, the judge, noted that Mr. Gorke was “actively ... involved in the actual event” and therefore, as the expert noted, in those circumstances, witnesses have “a greater recollection of what occurred.” In addition, the judge noted that Mr. Gorke had an estimated three to five minutes to observe the person who would later try to take his phone and during that period, because it preceded the actual robbery attempt, it was not stressful for him and he was not distracted. All of those factors are positive in assessing the accuracy of the identification.
The only factor mentioned by the expert that the judge considered that was not positive was the length of time between the incident and the photo identification. The judge observed that there was a nine-day delay, but “the length of time between the event and the identification by itself does not mean that it is reliable or unreliable under these circumstance.” The judge further observed that Mr. Gorke “testified in a very clear, precise, direct manner.... When he was unsure about a certain fact, he didn’t try to stretch or make it bigger than what it was.” In addition, the court concluded that the “testimony of the complaining witness ... is credited,” while noting that one-witness identifications are in many instances troubling, Mr. Gorke’s identification “is not one of them.” Moreover, noting there were some inconsistencies in Mr. Gorke’s testimony, the judge remarked that the inconsistencies were related to Gorke’s absence of memory due to the passage of time, and did not “undercut *1105 in any significant degree the reliability of his identification.” Finally, the judge noted that the witness made the identification “almost immediately” upon viewing the photo array and concluded that there was “nothing about the identification procedure that creates the type of subjectivity that would cause one [to] pause about the accuracy of the identification.” There is ample support in the record for these findings and I fully agree with the majority’s observation that Mr. Gorke’s identification constituted “formidable evidence.”
The majority, however, qualifies its “formidable evidence” assessment by describing it as only “arguably” so. The majority then determines that two circumstances present in this case are sufficient to override the trial judge’s finding of the reliability of Mr. Gorke’s identification. Specifically, the majority puts great stock in the fact that when Mr. Gorke was shown the photo of A.W., taken when he was stopped at the Gallery Place Station by Officer Ferguson approximately two-and-one-half hours after the offense, he testified that that the person depicted in that photograph (GovEx8) was not the assailant. Second, the majority concludes that the government’s claim that A.W. changed his appearance during the period between the offense and the taking of the photo was effectively disproved by Ferguson’s testimony that he viewed a video of the arrival of the train at Union Station as the incident was ending and saw that A.W. was already dressed as depicted in GovEx8. While the former is not an insignificant point, it is not, in my view, forceful enough, by itself, to override the trial judge’s finding that the identification was reliable. The second circumstance is entitled to no weight because it is not supported by the record and is refuted by Ferguson’s own testimony. I will now address both points, considering the latter one first.
As noted, the majority argues that Ferguson testified that when he viewed the video of the train entering Union Station and the passengers moved from the car to the platform, he recognized A.W. who he said was wearing the long hair and boots as depicted in GovEx8. He could not “clearly” see the face, however, and could not identify the person he saw in the video by what he saw of the face. That testimony is bolstered by an examination of the video which was taken from a distance and is of poor quality and which does not present a clear picture of the faces of any of those viewed. When Ferguson was asked: “[What] is it that you saw in the video that made you know which individual was [A.W.]?”, he answered: “[t]he clothing that was being worn.” Finally, when he was asked: “Had you not seen [A.W.] that evening ..., looking at the [Union Station] video, would you have known that it was [A.W.]?” His answer was: “No.” Based on that testimony it cannot be doubted that Ferguson did not know how A.W. was dressed at the time of the incident and only identified A.W. in the video based on the clothes he was wearing later that evening. Therefore, there is no basis for concluding that Ferguson’s testimony supported A.W.’s testimony or refuted the explanation given by the government that A.W. changed clothes and hair-do after the incident but before returning to the Metro.
The majority mainly relies on the fact that when shown GovEx8, Mr. Gorke said that was not the person who tried to take his phone and that the person shown was the cross-dresser. I agree with the majority where it says it cannot be doubted that GovEx8 is a photo of A.W. Indeed, when one places the photo of A.W. in the array next to the photo of A.W. taken the evening after the incident it is apparent, upon an examination of the two photos, together, that they are one and the same person. But in my view that fact is not decisive.
*1106 First, Mr. Gorke was not given the opportunity to look at the two photos together. Second, he had never seen GovEx8 before that time and the record is not at all clear as to how long he looked at that photo. He emphasized that while he saw the photo array “within a week” (it'was actually nine days) after the incident, he was not shown GovEx8 until nine months later. Finally, as the trial judge observed, there are major differences between the person depicted in GovEx8 and the assailant as described by Mr. Gorke. For example the judge noted that Mr. Gorke described the assailant as wearing a brown coat and short hair. The person shown in GovEx8 is wearing a different colored coat and what the judge characterized as a “wig” which, as noted above, extends several inches below the top of the shoulders. Based on these factors the judge concluded that the circumstances were consistent with the government’s suggestion that A.W. went somewhere to change his appearance.
The majority, however, says that the change of clothes theory is improbable. In the video of his interview A.W. raises a similar point when he stated “he wouldn’t have returned if he was guilty.” Actually, it makes perfectly good sense that if one has committed a criminal offense, and he must return near to the place where the offense was committed, he would do whatever is necessary to disguise his appearance including exchanging clothing with someone else and donning a wig.
For all of these reasons, there was much to support the trial judge’s conclusion that the identification was reliable. In addition, the trial judge noted some inconsistencies between what A.W. said to Detective Ferguson and what he said in video of his interview and some inconsistencies between different statements made in the video. The judge concluded: “I do not credit the exculpatory nature of the statement made by the A.W.” Another discrepancy, not mentioned by the trial judge is that in the video, as described above, A.W. stated that he wasn’t wearing a wig and, touching his hair he stated “at Union Station that night I had long hair like this.” As indicated, the judge concluded that A.W. was likely wearing a wig in GovEx8 and a comparison of that exhibit and the video clearly shows that the hair in Go-vEx8 is much longer than A.W.’s hair as shown in the video. Thus, A.W.’s statement about the length of his hair at the time of the incident is refuted by GovEx8.
In sum, Mr. Gorke was able to identify the photo of A.W. immediately when he was shown the array; he observed his assailant for between three and five minutes when he was not under any stress; and the trial judge, carefully weighing these and other factors, concluded that the testimony was credible and reliable. Moreover, the trial judge specifically rejected A.W.’s exculpatory statements and satisfied himself that Mr. Gorke’s failure to recognize A.W. as the person appearing in GovEx8 was due to a faded memory caused by the passage of time and the difference in the appearance of A.W. in the exhibit and the appearance of the assailant. Taken together these factors persuade me that the judge reasonably could “find the identification convincing beyond a reasonable doubt.” Benn II, supra, 978 A.2d at 1265-66. Therefore, I respectfully dissent from the majority’s decision to over-ride that determination.